**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ACCRUED FINANCIAL SERVICES,
INCORPORATED, for itself and as
assignee of claims,
              *Plaintiff-Appellant,*

                    v.

PRIME RETAIL, INCORPORATED; PRIME
RETAIL, L.P.; PRIME RETAIL FINANCE,
INCORPORATED; PRIME RETAIL FINANCE
II, INCORPORATED; PRIME RETAIL
FINANCE V, INCORPORATED; ARIZONA
FACTORY SHOPS PARTNERSHIP; BEND
FACTORY OUTLETS LIMITED
PARTNERSHIP; BUCKEYE FACTORY
SHOPS LIMITED PARTNERSHIP;
CAROLINA FACTORY SHOPS LIMITED          No. 00-1971
PARTNERSHIP; CASTLE ROCK FACTORY
SHOPS PARTNERSHIP; CORAL ISLE
FACTORY STORES LIMITED
PARTNERSHIP; FLORIDA KEYS FACTORY
SHOPS LIMITED PARTNERSHIP;
GAINESVILLE FACTORY SHOPS LIMITED
PARTNERSHIP; GROVE CITY FACTORY
SHOPS PARTNERSHIP; GULF COAST
FACTORY SHOPS LIMITED PARTNERSHIP;
GULFPORT FACTORY SHOPS LIMITED
PARTNERSHIP; HAGERSTOWN FACTORY
SHOPS LIMITED PARTNERSHIP;
HUNTLEY FACTORY SHOPS LIMITED
PARTNERSHIP; INDIANAPOLIS FACTORY
SHOPS LIMITED PARTNERSHIP; KANSAS
CITY FACTORY OUTLETS LIMITED

PARTNERSHIP; LATHAM FACTORY
STORES LIMITED PARTNERSHIP; OUTLET
VILLAGE OF LEBANON LIMITED
PARTNERSHIP; LOVELAND FACTORY
SHOPS LIMITED PARTNERSHIP;
MAGNOLIA BLUFF FACTORY SHOPS
LIMITED PARTNERSHIP; MARKET
STREET LIMITED; NEBRASKA CROSSING
FACTORY SHOPS LIMITED PARTNERSHIP;
NIAGARA INTERNATIONAL FACTORY
OUTLETS LIMITED PARTNERSHIP; OAK
CREEK FACTORY OUTLETS LIMITED
PARTNERSHIP; OHIO FACTORY SHOPS
PARTNERSHIP; OUTLET VILLAGE OF
KITTERY LIMITED PARTNERSHIP;
OXNARD FACTORY OUTLET PARTNERS;
FACTORY OUTLETS AT POST FALLS
LIMITED PARTNERSHIP; SAN MARCOS
FACTORY STORES LIMITED; SHASTA
OUTLET CENTER LIMITED
PARTNERSHIP; TRIANGLE FACTORY
STORES LIMITED PARTNERSHIP;
HORIZON GROUP, INCORPORATED, a/k/a
Prime Retail, Incorporated; HORIZON
GROUP PROPERTIES, INCORPORATED;
HORIZON GROUP PROPERTIES, L.P.;
FIRST HGI, INCORPORATED; SECOND
HGI, INCORPORATED; THIRD HGI,
L.L.C.; HGI PERRYVILLE,
INCORPORATED, a/k/a Prime Outlets
at Perryville Limited Partnership;
HORIZON/GLEN OUTLET CENTERS
LIMITED PARTNERSHIP, a/k/a Prime
Retail, L.P.; FIRST HORIZON GROUP

LIMITED PARTNERSHIP; SECOND
HORIZON GROUP LIMITED
PARTNERSHIP; THIRD HORIZON GROUP
LIMITED PARTNERSHIP; H/G
PERRYVILLE LIMITED PARTNERSHIP,
a/k/a Prime Outlets at Perryville
Limited Partnership; FINGER LAKES
OUTLET CENTER, L.L.C.;
HORIZON/GLEN GROUP, INCORPORATED,
a/k/a Prime Retail, Incorporated,
                          *Defendants-Appellees.*

ACCRUED FINANCIAL SERVICES,
INCORPORATED, for itself and as
assignee of claims,
                          *Plaintiff-Appellant,*

v.

PRIME RETAIL, INCORPORATED; PRIME
RETAIL, L.P.; PRIME RETAIL FINANCE,
INCORPORATED; PRIME RETAIL FINANCE
II, INCORPORATED; PRIME RETAIL
FINANCE V, INCORPORATED; ARIZONA
FACTORY SHOPS PARTNERSHIP; BEND
FACTORY OUTLETS LIMITED
PARTNERSHIP; BUCKEYE FACTORY
SHOPS LIMITED PARTNERSHIP;
CAROLINA FACTORY SHOPS LIMITED
PARTNERSHIP; CASTLE ROCK FACTORY
SHOPS PARTNERSHIP; CORAL ISLE
FACTORY STORES LIMITED
PARTNERSHIP; FLORIDA KEYS FACTORY
SHOPS LIMITED PARTNERSHIP;
GAINESVILLE FACTORY SHOPS LIMITED

No. 01-1231

PARTNERSHIP; GROVE CITY FACTORY
SHOPS PARTNERSHIP; GULF COAST
FACTORY SHOPS LIMITED PARTNERSHIP;
GULFPORT FACTORY SHOPS LIMITED
PARTNERSHIP; HAGERSTOWN FACTORY
SHOPS LIMITED PARTNERSHIP;
HUNTLEY FACTORY SHOPS LIMITED
PARTNERSHIP; INDIANAPOLIS FACTORY
SHOPS LIMITED PARTNERSHIP; KANSAS
CITY FACTORY OUTLETS LIMITED
PARTNERSHIP; LATHAM FACTORY
STORES LIMITED PARTNERSHIP; OUTLET
VILLAGE OF LEBANON LIMITED
PARTNERSHIP; LOVELAND FACTORY
SHOPS LIMITED PARTNERSHIP;
MAGNOLIA BLUFF FACTORY SHOPS
LIMITED PARTNERSHIP; MARKET
STREET LIMITED; NEBRASKA CROSSING
FACTORY SHOPS LIMITED PARTNERSHIP;
NIAGARA INTERNATIONAL FACTORY
OUTLETS LIMITED PARTNERSHIP; OAK
CREEK FACTORY OUTLETS LIMITED
PARTNERSHIP; OHIO FACTORY SHOPS
PARTNERSHIP; OUTLET VILLAGE OF
KITTERY LIMITED PARTNERSHIP;
OXNARD FACTORY OUTLET PARTNERS;
FACTORY OUTLETS AT POST FALLS
LIMITED PARTNERSHIP; SAN MARCOS
FACTORY STORES LIMITED; SHASTA
OUTLET CENTER LIMITED
PARTNERSHIP; TRIANGLE FACTORY
STORES LIMITED PARTNERSHIP;
HORIZON GROUP, INCORPORATED, a/k/a
Prime Retail, Incorporated; HORIZON
GROUP PROPERTIES, INCORPORATED;

HORIZON GROUP PROPERTIES, L.P.;
FIRST HGI, INCORPORATED; SECOND
HGI, INCORPORATED; THIRD HGI,
L.L.C.; HGI PERRYVILLE,
INCORPORATED, a/k/a Prime Outlets
at Perryville Limited Partnership;
HORIZON/GLEN OUTLET CENTERS
LIMITED PARTNERSHIP, a/k/a Prime
Retail, L.P.; FIRST HORIZON GROUP
LIMITED PARTNERSHIP; SECOND
HORIZON GROUP LIMITED
PARTNERSHIP; THIRD HORIZON GROUP
LIMITED PARTNERSHIP; H/G
PERRYVILLE LIMITED PARTNERSHIP,
a/k/a Prime Outlets at Perryville
Limited Partnership; FINGER LAKES
OUTLET CENTER, L.L.C.;
HORIZON/GLEN GROUP, INCORPORATED,
a/k/a Prime Retail, Incorporated,
                           *Defendants-Appellees.*

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-99-2573-JFM, CA-00-2474-JFM)

Argued: October 30, 2001

Decided: July 29, 2002

Before NIEMEYER, WILLIAMS, and MICHAEL, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the majority opinion, in which Judge Williams joined. Judge Michael wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** Rodney R. Patula, SQUIRE, SANDERS & DEMPSEY, L.L.P., San Francisco, California, for Appellant. Charles Preston Scheeler, PIPER, MARBURY, RUDNICK & WOLFE, L.L.P., Baltimore, Maryland, for Appellees. **ON BRIEF:** Diane L. Gibson, SQUIRE, SANDERS & DEMPSEY, L.L.P., San Francisco, California, for Appellant. Glen K. Allen, PIPER, MARBURY, RUDNICK & WOLFE, L.L.P., Baltimore, Maryland, for Appellees.

---

**OPINION**

NIEMEYER, Circuit Judge:

The district court declined to enforce, as void against public policy, contracts and related assignments between Accrued Financial Services, Inc. ("AFS") and its clients, who were tenants in outlet shopping malls. The contracts provided that AFS would conduct audits of the tenants' leases with their landlords and retain 40-50% of any discrepancy that AFS would discover and collect for the tenant. As part of the arrangement, the tenant assigned to AFS exclusive control of all potential legal claims that the tenant might have against the landlord. The district court concluded that the contractual arrangements were "champertous" and that they violated Maryland's public policy against private parties' "contingent fee witness agreements." For the reasons that follow, we affirm.

I

Accrued Financial Services, Inc. is a California corporation engaged in the business of conducting lease audits for tenants in commercial buildings and factory outlet malls. It is paid by retaining a percentage of the "discrepancies" that it discovers and collects as a result of its audits. As part of its arrangement with client-tenants, AFS requires that the tenant assign to AFS all legal claims that the tenant has against the landlord and give AFS control over any litigation that AFS might wish to initiate to enforce the claims.

The relationship is typically documented by a "Letter of Agreement Regarding Leased Locations" and an "Assignment of Cause of Action." In the Letter of Agreement, the tenant authorizes AFS "to serve as sole and exclusive representative" of the tenant for the purpose of reviewing the lease relationship and appoints AFS "to contact, negotiate, and settle with Clients' landlords" any overcharge discovered by AFS. The tenant also gives AFS authority to pursue collection of any overcharge, which the agreement refers to as a "Discrepancy," using "its normal collection practices," including authority "to file all lawsuits under AFS's name as plaintiff" and "full discretion [after consultation with the tenant] to accept or reject any settlement or other disposition." Finally, under the Letter of Agreement, the tenant authorizes AFS to retain as its fee 40-50% of any "discrepancy" discovered and collected. If the tenant chooses not to pursue the discrepancy, the tenant must pay AFS 40% of the discrepancy "as a Cancellation fee for providing Client [tenant] with valuable information and services."

The Assignment of Cause of Action, executed in connection with the Letter of Agreement, provides that the tenant assigns to AFS "any and all causes of action [tenant] may have" against its landlord "arising solely from periodic (including annual) charges of any type whatsoever made by or on behalf of the Landlord." The Assignment provides that AFS "may adjust, compromise, or settle the assigned cause of action at its reasonable discretion." AFS retains as a commission 40-50% of the net recovery, defined to be the total recovery less attorneys fees and litigation costs. The Assignment provides that it is "governed by and construed in accordance with the laws of California."

Pursuant to a particular Letter of Agreement and Assignment, AFS conducted audits at two large factory outlet malls, one in Michigan, owned by Horizon Group, Inc., and the other in Baltimore, Maryland, owned by Prime Retail, Inc.[1] These audits purportedly led AFS to find more than mere "discrepancies." AFS contends that it discovered that Prime Retail had made "improper charges and reserve assessments which could not be explained as mere errors or even aggressive bill-

---

[1]Prime Retail has now acquired Horizon and therefore we refer to the two collectively as "Prime Retail."

ing practices. The errors were systematic and pervasive." Rather than simply "contact[ing], negotiat[ing], and settl[ing]" the discrepancies, AFS persuaded 16 other tenants located in Prime Retail malls to enter into similar contractual relationships with AFS[2] and thereby launched a larger attack against Prime Retail.

In May 1998, on behalf of the 17 tenants, AFS sent Prime Retail a demand letter in connection with a broad array of claims that AFS asserted it had discovered and acquired through assignments. In response, Prime Retail filed an action in the Circuit Court for Queen Anne's County, Maryland, seeking a declaratory judgment that AFS was not the proper plaintiff on the claims and therefore lacked standing to assert them. Shortly thereafter, AFS commenced an action in the Central District of California for the claims it discovered in Michigan and Maryland, alleging RICO violations (i.e., violations of the Racketeering Influenced and Corrupt Organizations Act), violations of the California Business and Profession Code, fraud, breach of express and implied lease covenants, and related claims involving malls across the country. The district court in California transferred the action to the District of Maryland, after which AFS voluntarily dismissed the case without prejudice.

AFS then commenced a second action in the Circuit Court for Baltimore City, Maryland, which Prime Retail removed to federal court. In that action, AFS, suing in its own name on behalf of 17 tenants at almost 50 locations, alleged nine different causes of action similar to those alleged in the first action. It asserted two additional counts on its own behalf, alleging tortious interference with AFS's contractual relations and prospective advantage. Prime Retail filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 17, as well as under 28 U.S.C. § 1367 (conferring supplemental jurisdiction). Among other things, Prime Retail contended that AFS lacked

---

[2]One of the tenants did not sign a Letter of Agreement and Assignment but rather signed a similar document entitled "Consultant Agreement." Under the Consultant Agreement, AFS was to retain a fee of 50% of all "net recoveries," defined as the amount the tenant or AFS "actually received" from the landlord. The Consultant Agreement gave the tenant the right to disapprove any claims prepared by AFS and did not contain an assignment clause.

standing to bring the claims because the alleged assignments were invalid as against public policy.[3] With respect to the two claims brought on AFS's own behalf — both under state law — Prime Retail urged the district court not to exercise supplemental jurisdiction.

The district court granted Prime Retail's motion to dismiss because "the assignments made by the tenants to AFS [were] void as a matter of public policy because they [were] champertous." The court also concluded that the assignments were void because they violated the public policy of both California and Maryland against "contingent fee witness agreements." The court observed that "[f]inancial arrangements that provide incentives for the falsification or exaggeration of testimony threaten the very integrity of the judicial process which depends upon the truthfulness of the witnesses." The court concluded that, without the assignments, AFS had no interest in the claims, and accordingly, it dismissed the first nine counts for AFS' lack of standing. With respect to the two state-law counts asserted by AFS on its own behalf, the district court declined to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c). From the district court's judgment in this case, AFS filed one of the appeals before us.

After the district court dismissed this second suit, AFS commenced a third action in state court, identical to the second action, to protect itself against the running of the statute of limitations on the two state-law claims. This action was again removed to federal court, and the district court again dismissed the first nine counts, now relying on the doctrine of *res judicata*. With respect to the two state-law causes of action, however, the court stayed disposition pending appeal. The court then certified final judgment under Federal Rule of Civil Procedure 54(b). AFS also filed an appeal from this judgment.

The two appeals now before us are concurrent, raising the same issue — whether the contractual arrangements between AFS and the tenants are void as against the public policy of Maryland.

---

[3]Prime Retail also asserted that AFS did not adequately allege causes of action under RICO; that punitive damage claims could not be assigned to AFS by the tenants; and that the facts alleged did not amount to a claim under California's unfair competition statute.

## II

AFS's standing to bring the claims at issue was created solely through the tenants' assignments to AFS of all legal claims that AFS discovered through its audits. Without the assignments, AFS had no interest in the tenants' claims. Moreover, AFS's interest in the claims was not based on securing any underlying transaction or preexisting commercial relationship between the tenants and AFS or satisfying any preexisting obligation. In short, AFS's interest in the litigation was solely to collect fees that its audits and litigation would generate.

AFS seeks to justify its contractual arrangements with the tenants under standard principles of assignment law, which recognize the legality of assigning both existing and potential choses in action, so long as the causes of action survive the death of the assignor. As AFS correctly asserts, those principles apply under both the law of Maryland and the law of California. *Hernandez v. Suburban Hosp. Ass'n, Inc.*, 572 A.2d 144, 148 (Md. 1990) ("'[A] chose in action in tort is generally assignable, in the absence of a statutory prohibition, if it is a right which would survive the assignor and could be enforced by his personal representative'" (quoting *Summers v. Freishtat*, 335 A.2d 89, 92 (Md. 1975))); *Curtis v. Kellogg & Andelson*, 86 Cal. Rptr. 2d 536, 545 (Cal. Ct. App. 1999) (stating California's rule that choses in action arising "out of an obligation, breach of contract, violation of right of property, or damage to personal or real property" are assignable).

Because all of the claims asserted in this case were commercial claims that would survive the death of the assignor, there is no question that the choses in action were generally assignable. But that general principle, heavily relied upon by AFS, does not override the principle that an assignment, like any other contract, is enforceable only to the extent that it is consistent with public policy. *See, e.g., Hernandez*, 572 A.2d at 148 (considering whether there were any public policy reasons to preclude a particular assignment); *see also McCabe v. Medex*, 786 A.2d 57, 62 (Md. Ct. Spec. App. 2001) ("[A] contract conflicting with public policy set forth in a statute is invalid to the extent of the conflict between the contract and that policy.").

While the assignments in this case contain a choice-of-law provision providing that California law governs, the parties' choice of law

provision is enforceable only to the extent that the chosen law does not violate a fundamental public policy of the forum state, Maryland. *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 659 A.2d 1295, 1301 (Md. 1995) (stating that a choice-of-law clause will not be honored if "the strong fundamental public policy of the forum state precludes the application of the choice-of-law provision"); *see also Restatement (Second) of Conflict of Laws* § 187(2)(b) (1971). We must therefore determine whether the Assignments in this case violate Maryland's public policy.

At the outset, we observe that the assignments of the choses in action in this case were not made for the traditional purposes of securing an existing transaction, collecting on a pre-existing debt, giving effect to a form of subrogation, or satisfying a preexisting obligation. Rather, they were sought by AFS to further its business of uncovering claims and earning fees from collecting on them.

In entering into the arrangements at issue, AFS held itself out to the tenants as an expert in conducting audits of commercial leases, and it proposed to search the tenant's files for claims of which the tenant had no knowledge. There is no suggestion that the tenants knew or suspected wrongdoing before AFS proposed to perform the audits. As far as the tenants were concerned, there could have been major claims, minor claims, or no claims at all. The Letter of Agreement stated, quite simply, that AFS would seek to discover discrepancies. But despite this initial focus on discrepancies, AFS relied on the Assignment of choses in action to give effect to its contingent fee business, which was implemented in a manner that served AFS's interest more than the legitimate interest of resolving discrepancies in a manner suitable to the tenant.

The Assignments encompassed "any and all causes of action," present and future, and the consideration for them was not fixed but rather dependent on what AFS could discover. If discrepancies were discovered, the corresponding claims would immediately become the property of AFS under its sole control. And if, after discovery of the claims, the tenant were to determine that it would not be in the tenant's best interest to pursue litigation, there was no effective way to prevent AFS from prosecuting the claim in court. The cost to a tenant for refusing to cooperate or provide the information necessary for the

litigation was the obligation to pay AFS the fee that it otherwise would have earned had it successfully prosecuted the litigation. Thus, the tenant was left with the Hobson's Choice of allowing AFS to design and pursue a lawsuit on the tenant's behalf or of paying AFS its contingency fee as if AFS had succeeded, regardless of the merits of the proposed claim.[4]

In short, the Assignments, which were purchased with contingent consideration, gave AFS effective control over discovery and design of lawsuits, of which the assignor had no knowledge, without requiring, upon discovery, a renewed consent from the real party in interest before proceeding with litigation.

These relationships between AFS and the tenants were essentially lawsuit-mining arrangements under which AFS "mined for" and prosecuted lawsuits with no regard for the informed wishes of the real parties in interest. AFS thus became a promoter of litigation principally for the sake of the fees that it would earn for itself and not for the benefit that it might produce for the tenant, the real party in interest. Under these arrangements, even though the tenant might conclude, after reviewing the facts uncovered, that a lawsuit would imprudently damage the landlord-tenant relationship — or that pursuing aggressive allegations would do more harm than good — the tenant lost the right to control its destiny. Because we see these broad assignments as nothing more than arrangements through which to intermeddle and stir up litigation for the purpose of making a profit, we conclude that they violate Maryland's strong public policy against stirring up litigation and are therefore void and unenforceable in Maryland.

The Court of Appeals of Maryland has recognized that the early common law had, in varying degrees, prohibited barratry, maintenance, and champerty, declaring contracts that provide for such conduct to be void.[5] *See Son v. Margolius*, 709 A.2d 112, 119 20 (Md.

---

[4]In contrast to this arrangement where AFS had total control over prosecuting its discoveries, the Consultant Agreement, signed by one tenant, gives the tenant the opportunity to review AFS' discoveries and to disapprove claims proposed by AFS.

[5]Blackstone defined "*common barratry*" as the offense of "frequently exciting and stirring up suits and quarrels"; "*maintenance*" as "an offi-

1998); *accord* 7 *Williston on Contracts* §§ 15.1, 15.4 (Richard A. Lord ed., 4th ed. 1997). But over time, the early definitions proved too broad and interfered with emerging commercial conditions, the recognition of assignments in general, and the rise of attorney representation under contingent-fee contracts. *See Son*, 709 A.2d at 119-21; *see generally* Max Radin, *Maintenance by Champerty*, 24 Cal. L. Rev. 48 (1935-36). Accordingly, the defining nature of barratry, maintenance and champerty changed over the years.

But despite the law's metamorphosis, Maryland continues to reserve a policy against some of the originally prohibited conduct. For example, the Maryland Court of Appeals explained, in *Son*, that conduct once characterized as maintenance is now prohibited in Maryland under the label of barratry. *Son*, 709 A.2d at 120-21. The Maryland court observed that the broad definition of maintenance given in Blackstone's *Commentaries* did not survive in Maryland, *id.* at 120, but that a more narrow form was retained under barratry, which remains against Maryland public policy. Thus, the common law has simply been redefined under a modern form of barratry to reflect the current public policy against "improperly, and for the purpose of stirring up litigation and strife, encourag[ing] others either to bring actions, or to make defenses which they have no right to make." *Id.* (internal quotation marks and citation omitted); *Schaferman v. O'Brien*, 28 Md. 565, 574 (1868) (citation omitted); *see also Wheeler v. Harrison*, 50 A. 523, 526 (Md. 1901) (noting that the public policy is violated where "one officiously and without just cause intermeddles in and promotes the prosecution or defense of a suit in which he has no interest by assisting either party with money or otherwise"). In other words, the concepts of "officious meddling" and "personal gain" reflect the modern policy, described by *Williston*, against enforcing "schemes to promote litigation for the benefit of the promoter rather than for the benefit of the litigant or the public." 7 *Williston on Contracts* § 15:4.

---

cious intermeddling in a suit that no way belongs to one, by maintaining or assisting either party with money or otherwise to prosecute or defend it"; and "*champerty*" as a "bargain with a plaintiff or defendant . . . to divide the land or other matter sued for between them . . . whereupon the champertor is to carry on the party's suit at his own expense." 4 William Blackstone, *Commentaries* *134-36.

Indeed, an aspect of the public policy developed under Maryland's common law was codified as a Maryland criminal statute, outlawing "barratry," as follows:

> Without an existing relationship or interest in an issue[,] a person may not, for personal gain, solicit another person to sue or to retain a lawyer to represent the other person in a lawsuit.

Md. Code Ann., Bus. Occ. & Prof. Art., § 10-605(a)(1). The Court of Appeals has characterized this statutory offense as the "stirring up, meddling in, or maintaining litigation in which the person has no interest, for personal gain." *Son*, 709 A.2d at 121. And the key elements to the statutory offense are "officious meddling" and "personal gain." *Id.*

Thus, through surviving common law principles and statutory prohibition, the current fundamental public policy of Maryland prohibits schemes to stir up and promote litigation for the benefit of the promoter rather than for the benefit of the real party in interest. Any contract violating this policy is void in Maryland and will not be enforced by its courts.

Considering the contractual arrangements before us, it is apparent that they violate Maryland's strong public policy. These Assignments are not typical assignments of choses in action, which further existing or underlying commercial transactions. They are, rather, "schemes to promote litigation for the benefit of [AFS] rather than for the benefit of the litigant or the public." As we explained above, the tenants, who were the real parties in interest, assigned rights in litigation of which they had no knowledge. Moreover, these rights were assigned, not in exchange for an existing value, but for future fees to be determined by decisions and value judgments controlled by AFS, who had no interest in the underlying claims. Because the rights were assigned before their nature, costs and benefits could be assessed, the real parties in interest — the tenants — had no opportunity to evaluate whether their prosecution was in the tenants' interest. As such, AFS was given the power to mine lawsuits, promote them, and profit off of them without regard to the interests and desires of the injured party.

The essence of the contractual relationship between AFS and the tenants leaves AFS as a solicitor, for personal gain, of unknown litigation, in the business of stirring up litigation for the sake of its fees. If its real purpose was to provide consulting services within its expertise, as it insists, it can continue that business without the assignments. By concluding that the assignments in this case are against fundamental public policy, we in no way undermine or devalue any claims that AFS has discovered and that the tenants may have. If those claims are viable, the tenants retain the right to prosecute them with the assistance of AFS. Our holding focuses only on the promotional efforts of AFS in stirring up litigation primarily at its own initiative and for its own benefit.

We thus agree with the district court that, whether under the label of maintenance, champerty or barratry, the Assignments in this case violate Maryland's strong public policy against the stirring up litigation or promoting litigation for the benefit of the promoter rather than for the benefit of the litigant or the public.

### III

In addition to our conclusion that the Assignments violate Maryland's public policy against barratry, we also conclude that the arrangements are against public policy insofar as they provide for supplying *expert* testimony for a contingent fee. To the extent that AFS employees, as experts on the relationship between landlords and tenants in a commercial context, planned to testify regarding the allegations in this litigation, AFS was offering expert testimony for a contingent fee. Such an arrangement would also violate public policy, as articulated more fully by the district court.

Because of our rulings, we need not reach the other issues raised by AFS on appeal. The judgment of the district court is

*AFFIRMED.*

MICHAEL, Circuit Judge, dissenting:

A number of tenants at factory outlet malls engage Accrued Financial Services, Inc. (AFS) to audit common area maintenance charges

that landlords add to the tenants' rent bills. AFS takes an assignment of any claims discovered in the audits and retains a percentage of any overcharges collected as a fee for its services. This sounds like a sensible arrangement, and it is one that is legal under California law, the law chosen by AFS and the tenants to govern their contracts. The majority outlaws the assignments, however, saying that the assignments stir up lawsuits and allow AFS to supply expert testimony for a contingent fee, all in violation of the public policy of Maryland, the forum state. I respectfully dissent for two reasons. First, the Restatement (Second) of Conflict of Laws § 187, which Maryland has adopted, requires that the contracting parties' choice of California law be honored in this case. Even if Maryland law did apply, it would not prevent the tenants from protecting themselves through the arrangement chosen for the discovery and collection of overcharges, an arrangement that avoids litigation more than nine times out of ten. Second, because AFS owns the claims that are the subject of this lawsuit, the company is not supplying expert testimony for a contingent fee.

## I.

AFS is a California-based company that provides lease audit services for tenants operating stores in factory outlet malls throughout the United States. Mall landlords, such as Prime Retail, Inc. (Prime),[1] commonly require their tenants to sign leases that obligate the tenants to pay assessed charges for common area maintenance expenses. These charges cover certain mall operating expenses, ranging from real estate taxes to marketing and promotional costs. In some cases, the leases require the tenants to pay into a reserve fund that is set aside to cover these expenses. Invoices to tenants for common area maintenance charges are usually in summary form. The leases, however, permit the tenants to conduct audits of these charges. That is where AFS comes in: it conducts the audits for tenants.

According to AFS, an audit usually reveals some errors in charges billed to the tenant, and occasionally an audit uncovers overly aggressive or dishonest calculation of charges. In most cases, each tenant's claim for an audit period (usually one year) is relatively small in dol-

---

[1]"Prime" includes Horizon Group, Inc., a company acquired by Prime.

lar amount. Thus, most tenants do not find it economically feasible to conduct their own audits. But AFS, by securing audit engagements from several tenants in the same mall and then conducting a single audit for those tenants, makes the contractual right to conduct audits meaningful for the individual tenant. AFS performs the audits in return for a percentage of any overcharges it collects. The contingent nature of AFS's compensation also helps to make the audits afford-able. Overcharges are collected without litigation more than ninety percent of the time.

AFS's authority to conduct the lease audits and pursue collection of overcharges is set forth in two agreements entered into between AFS and the tenant, a "Letter of Agreement Regarding Leased Loca-tion" and an "Assignment of Cause of Action." In the "Letter of Agreement" the tenant designates AFS as its representative to conduct a lease audit, and AFS agrees to "use reasonable efforts to ascertain . . . whether [the tenant] has been overcharged for any Tenant Contri-butions." The tenant assigns any overcharges to AFS. AFS is autho-rized "to contact, negotiate, and settle" with the landlord and "to file all lawsuits under AFS's name as plaintiff." For its work, AFS retains 40 to 50 percent of any overcharges recovered, and the tenant gets the balance. The "Assignment of Cause of Action" spells out the details in routine fashion. The tenant assigns to AFS "any and all causes of action it may have against" the landlord. "Full authority is conferred on Assignee [AFS] to perform all lawful acts deemed necessary by Assignee, or its agents, to pursue and collect on the assigned cause of action. Assignee may adjust, compromise, or settle the assigned cause of action at its reasonable discretion." AFS must "advance all litigation costs incurred and be personally liable for those costs." In addition, "[u]nder no circumstances shall Assignor [the tenant] be lia-ble for any litigation costs in excess of any recovery on the claim." Finally, the assignment provides that it will "be governed by and con-strued in accordance with the laws of California."

In 1997 AFS began audits at Prime, which owns and manages fac-tory outlet malls where a number of AFS's clients are tenants. The audits were commenced in Michigan and Maryland. According to AFS, the audits uncovered improper charges and reserve assessments that cannot be explained as inadvertent errors or even as aggressive billing practices. AFS claims that that the audits revealed a systematic

effort by Prime to conceal from the tenants the improper nature of many of the charges assessed. AFS further claims that it discovered a pattern of fraud on the part of Prime that has likely resulted in millions of dollars in overcharges to tenants. Finally, AFS claims that when it began to uncover the scheme in the audit it was conducting in Maryland, Prime stopped the audit before it was finished. The majority opinion describes several lawsuits (the first one was filed by Prime) that ensued between Prime and AFS, after Prime refused to negotiate. In this case, AFS, as assignee of seventeen tenants with stores in dozens of malls, sues Prime for breach of express and implied lease covenants, fraud, and violations of RICO and the California unfair competition statute.

## II.

### A.

The majority's main holding is that the tenants' assignments to AFS are void because they violate a strong public policy in Maryland against "stirring up litigation," whether it be called maintenance, champerty, or barratry. *Ante* at 15. The majority thus rejects California law, the law chosen by AFS and the tenants to govern the application and validity of the assignments. California does not recognize the doctrines of maintenance and champerty, *see Abbott Ford, Inc. v. Superior Court*, 741 P.2d 124, 141 n.26 (Cal. 1987), and no person can be convicted of barratry unless he has corruptly or maliciously "excited" at least three vexatious lawsuits, *see* Cal. Penal Code § 159 (2002). The assignments are therefore valid under California law. The majority nonetheless contends that the choice of law provision is not enforceable because the chosen (California) law violates a fundamental policy of the forum state, Maryland. The majority is wrong, I respectfully suggest, because three conditions must be present before Maryland will refuse to apply, for public policy reasons, the law selected by the parties to a contract. None of these conditions are present in this case.

Maryland recognizes "that the parties to a contract may agree as to the law which will govern their transaction, even as to issues going to the validity of the contract." *Kronovet v. Lipchin*, 415 A.2d 1096, 1104 (Md. 1980). Maryland relies on section 187 of the Restatement

(Second) of Conflict of Laws to determine the validity of a contractual choice of law provision. *Nat'l Glass, Inc. v. J.C. Penney Props., Inc.*, 650 A.2d 246, 248 (Md. 1994); *Ciena Corp. v. Jarrard*, 203 F.3d 312, 323 (4th Cir. 2000). Section 187(2) of the Restatement provides in pertinent part:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, . . . unless . . .
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(2) (Supp. 1989). Three conditions must therefore be met before Maryland would reject California law on the ground that Maryland public policy is implicated. First, Maryland law must apply in the absence of an effective choice of law provision. Second, the California law must be contrary to a fundamental (or strong) public policy of Maryland. Third, Maryland must have a materially greater interest than California in the outcome of the particular issue, here, whether the assignments are legal. The majority never addresses the first and third conditions even though all three must be met under the Restatement rule adopted by Maryland. *See Nat'l Glass*, 650 A.2d at 248-251.

As to the first condition, the question is whether Maryland law would apply if the parties had not made a choice in their contract. Maryland relies on *lex loci contractus* if there is no choice of law provision. *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 659 A.2d 1295, 1301 (Md. 1995). "Under this principle, the law of the jurisdiction where the contract was made controls its validity and construction." *Kramer v. Bally's Park Place, Inc.*, 535 A.2d 466, 467 (Md. 1988). This case was decided on Prime's motion to dismiss, and there is no suggestion in the pleadings or in the motion papers that the assignment contracts between AFS and its clients (the outlet mall tenants)

were made in Maryland. Indeed, it appears highly unlikely that the contracts would have been made in Maryland because AFS is located in Long Beach, California, and none of the tenants are headquartered in Maryland. In sum, at this stage the record does not allow a determination that Maryland law would apply to the assignments in the absence of a choice of law provision. Thus, the first condition of § 187(2)(b) of the Restatement has not been met.

For the second condition, the question is whether California law — the law that would allow the assignments — violates a strong public policy of Maryland. The existence of a routine difference between California and Maryland law would not be sufficient to satisfy this condition: "merely because Maryland law is dissimilar to the law of another jurisdiction does not render the latter contrary to Maryland public policy." *Am. Motorists*, 659 A.2d at 1301 n.3. Rather, for the second condition to be met, there must be a *strong* public policy against the enforcement of the foreign law in Maryland. *Bethlehem Steel Corp. v. G.C. Zarnas & Co.*, 498 A.2d 605, 608 (Md. 1985). So far, the only time Maryland courts have found a contractually chosen law to violate strong Maryland policy is when the foreign law conflicts with a Maryland statute that contains a clear statement of policy. *See Bethlehem Steel*, 498 A.2d at 608 (law of chosen state permitted a contract that a Maryland statute expressly described as one that "is against public policy" and "is void and unenforceable."); *Nat'l Glass*, 336 Md. at 250 (chosen law clashed with Maryland statute stating that "any provision . . . made in violation of this section is *void as against the public policy of this State*."). The Maryland courts have not yet said whether a chosen law is contrary to a public policy that can only be inferred from Maryland's common law. In any event, strong Maryland public policy cannot "be represented by a [common law] rule [that is] tending to become obsolete." Restatement § 187(2) cmt. g (Supp. 1989). Maryland's common law on maintenance, champerty, and barratry appears to be tending toward obsolescence because, as far as I can tell, Maryland has not used these common law doctrines to invalidate any contract in the last one hundred years.[2] Indeed, as

---

[2]The majority does not cite a single case in which a contract was found to violate any Maryland common law against maintenance, champerty, or barratry. The assignment contracts in both *Schaferman v. O'Brien*, 28

far back as 1868 the Court of Appeals of Maryland noted that "the common law notion of maintenance, as applicable to the assignments of rights of action, had become practically obsolete." *Schaferman v. O'Brien*, 28 Md. 565 (1868) (quoting Story's Equity Jur. § 1057). Accordingly, no strong public policy against the California law allowing the assignments in this case can be gleaned from whatever, if anything, might remain of the common law doctrines of maintenance, champerty, and barratry in Maryland.

If there is any strong public policy to be found here, it must be found in Maryland's barratry statute. For that statute to evidence strong Maryland policy, the policy must be "expressly stated" or "explicit[ly] determin[ed]" by the General Assembly. *Nat'l Glass*, 650 A.2d at 249-50 (internal quotations and citations omitted). Maryland's barratry statute, as applied to non-lawyers, provides: "Without an existing relationship or interest in an issue . . . a person may not, for personal gain, solicit another person to sue or to retain a lawyer to represent the other person in a lawsuit." Md. Code Ann., Bus. Occ. & Prof. § 10-604(a)(1) (2000). The General Assembly has not made any express statement of strong public policy in this language. It is simply a run-of-the-mill misdemeanor provision.

There is, then, no indication that application of the law of the chosen state, California, would be contrary to any strong public policy of Maryland. But even if it could be shown that the assignments violated strong Maryland policy, that would not end the matter because it still "must [be] determine[d] whether Maryland has a materially greater interest in the determination of the issue." *General Ins. Co. of Am. v. Interstate Serv., Inc.*, 701 A.2d 1213, 1218-19 (Md. Ct. Spec. App. 1997). In determining whether Maryland has a materially greater interest in an issue, the courts of Maryland (1) evaluate the contacts the parties and their contract have with Maryland and the chosen state and (2) take into account strong Maryland public policy that bears on

---

Md. 565 (1868), and *Wheeler v. Harrison*, 50 A. 523 (Md. 1901), were upheld. The majority's only case from the last hundred years, *Son v. Margolius, Mallios, Davis, Rider & Tomar*, 709 A.2d 112 (Md. 1998), focused on Maryland's barratry statute. In any case, the agreement in *Son* was also upheld.

the issue. *See Nat'l Glass*, 650 A.2d at 250-51. The contacts listed in Restatement § 188(2) are the ones evaluated in deciding which state has a materially greater interest. *See, e.g.*, *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 938 (9th Cir. 2001). These contacts include:

>    (a)   the place of contracting,

>    (b)   the place of negotiation of the contract,

>    (c)   the place of performance,

>    (d)   the location of the subject matter of the contract, and,

>    (e)   the domicil, residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Conflict of Laws § 188(2) (1971).

Factor (e), which focuses on the location of the contracting parties and their places of incorporation, favors California. AFS is a California corporation, with its sole place of business in Long Beach, California. Four of AFS's clients are headquartered in California, and none are headquartered in Maryland. Factors (a) and (b), which focus on where the contract was negotiated and made, almost certainly favor California: given the contracting parties' physical locations, there is no reason to believe that the contracts were negotiated or entered into in Maryland. Factor (d), relating to the location of the subject matter of the contracts (here, the outlet stores and leases), also appears to favor California. At least a dozen of AFS's seventeen clients have outlet stores in California, and only five have stores in Maryland. Every client with stores in both states has more stores in California than in Maryland. For example, client Claire's Boutiques, Inc. has four stores in California and two in Maryland. Information relevant to factor (c), the place of performance of the contracts, is somewhat sparse. We do know that AFS started audits in Michigan and Maryland and that Prime forced AFS to stop the Maryland audit before it was completed. The Maryland audit, which Prime itself ended, is the only contact that could count in Maryland's favor. In any event, when the information about all of the factors is considered

together, California has significantly more contacts with the matter than Maryland.

As mentioned, in deciding which state has a materially greater interest (the third condition of Restatement § 187(2)(b)), Maryland also considers whether it has a strong public policy against the chosen law. *Nat'l Glass*, 650 A.2d at 251. Here, of course, Maryland has no strong public policy against champerty, maintenance, or barratry. Because the contacts strongly favor California, and because Maryland has no strong public policy against the assignments, it is evident that California has a materially greater interest in the outcome of this case than Maryland. In conclusion, because the contracting parties' choice of California law must be respected under the terms of Restatement § 187(2)(b), California law governs any issue concerning the validity of the assignments. The majority, which fails to conduct a full analysis, errs in holding that Maryland would not honor the choice-of-law provision agreed to by AFS and its clients, the outlet mall tenants.

## B.

There is another fundamental problem with dismissing AFS's case. The limited record, which was made in connection with Prime's motion to dismiss, does not establish that AFS's conduct meets the legal standards required for whatever is left of the doctrines of champerty, maintenance, and barratry in Maryland. Again, Maryland does have a barratry statute which provides: "Without an existing relationship or interest in an issue . . . a person may not, for personal gain, solicit another person to sue or to retain a lawyer to represent the other person in a lawsuit." Md. Code Ann., Bus. Occ. & Prof., § 10-604(a)(1) (2000). According to the Maryland Court of Special Appeals, "[t]he essence of [the crime of] barratry is the solicitation of another to make a litigious claim by one without an existing relationship or interest for his own gain." *Schackow v. Medical-Legal Consulting Serv., Inc.*, 416 A.2d 1303, 1312 (Md. Ct. Spec. App. 1980). AFS was not pushing or soliciting litigation here. AFS's first, and most important, task under the agreements and assignments was to conduct audits, audits the tenants had the right to pursue under their leases. If AFS found an overcharge, it had the authority to contact the landlord and obtain a refund or negotiate a settlement. Litigation is available as a last resort, and AFS has had to pursue litigation in rela-

tively few cases. AFS's president, Mark S. Malan, confirms this in his *unrefuted* affidavit:

> In my 15 years of performing reviews of commercial leases and 5 years experience in performing lease audits, it has only rarely been necessary to commence legal action against a landlord or management company to collect overcharges. In fact, I estimate that litigation has been required in less than 10% of the engagements for which we have been retained.

AFS thus did not solicit its clients to make litigious claims. In this case, in particular, litigation became necessary only because Prime shut down an audit and refused to negotiate. AFS has thus not committed barratry under the Maryland statute, and it has not been "stirring up litigation" or "mining for lawsuits," as the majority charges.

Even if the common law doctrines of champerty, maintenance, and barratry are not obsolete in Maryland, what is left of them does not apply to this case. In the first place, these doctrines do not outlaw every effort by a person to encourage or assist another in pursuing litigation. The Maryland Court of Appeals recognized this in *Son* when it quoted Lord Abinger, Chief Baron of the Court of Exchequer, who said: "if a man were to see a poor person in the street oppressed and abused, and without the means of obtaining redress, and furnished him with money and employed an attorney to obtain redress for his wrongs, it would require a very strong argument to convince me that that man could be said to be stirring up litigation and strife." *Son*, 709 A.2d at 120 n.5 (quoting *Findon v. Parker*, 11 M. & W. 679 (1843)). Lord Abinger's comment in 1843 is simply the starting point. Today, we allow many practices that encourage litigation. For example, contingent fees are legal, Maryland Rules of Professional Conduct 1.5(c); lawyers are allowed to advertise, *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977); choses-in-action may be assigned, *Hernandez v. Suburban Hosp. Assoc., Inc.*, 572 A.2d 144 (Md. 1990); and class actions are permitted, Fed. R. Civ. P. 23.

The common law, to the extent it is still viable, would thus not outlaw all efforts to facilitate litigation. Rather, it would be aimed at the stirring up of a certain kind of litigation, specifically, litigation that

is groundless, vexatious, or multitudinous. *See Osprey, Inc. v. Cabana Ltd. P'ship*, 532 S.E.2d 269, 273 (S.C. 2000) ("The laws against champerty, maintenance and barratry are aimed at the prevention of multitudinous and useless lawsuits."). When the allegations in the complaint in this case are taken as true, as they must be on a motion to dismiss, it cannot be said that AFS is pursuing, or encouraging the pursuit of, groundless, vexatious, or multitudinous litigation. Rather, AFS makes a serious claim, based on a partial audit, that Prime over-charged its tenants, through aggressive billing or fraud, in amounts that could total millions of dollars. Moreover, because AFS must bear the expenses of any unsuccessful litigation, it is unlikely that it would waste its resources on a pointless lawsuit. In any case, if AFS has filed a frivolous or vexatious lawsuit — and there is no indication thus far that it has — there is a way to deal with the problem without outlawing the assignments. Rule 11, for example, allows stiff sanctions to be imposed upon lawyers and parties who present pleadings "for any improper purpose, such as to harass" or who present pleadings that lack "evidentiary support." Fed. R. Civ. P. 11(b), (c).

The doctrines of champerty, maintenance, and barratry were also meant to protect against "financial overreaching by a party of superior bargaining position." *Saladini v. Righellis*, 687 N.E.2d 1224, 1226 (Mass. 1997). The majority implies that AFS engaged in overreaching here, saying that the assignments leave the tenants with the Hobson's choice of either allowing AFS to pursue litigation or buying back their claims for an amount equal to AFS's fees. There is every reason to believe that the tenants, who are large outlet store companies such as Anne Klein Factory Stores, Inc., Corning Revere Factory Stores, Publisher's Warehouse, and Lechter's, were able to bargain with AFS on equal footing. Indeed, the tenants are substantial companies, and AFS has less than a half dozen employees. It is reasonable to conclude that had the tenants not found the assignments to be advantageous, they would not have executed them. Also, there is no evidence that any tenant was reluctant to allow AFS to sue Prime because all of the tenants ratified their assignments after the lawsuit began. Thus, the majority's argument that the assignments serve AFS's interests more than its clients' (the tenants') interests is without any foundation. Although it is true the tenants could have retained their claims and sued in their own names, history has proven that option to be uneconomical in most instances. That is why the tenants assigned their

claims to AFS in the first place. The majority's decision thus hurts the tenants, not just AFS. The decision benefits the mall owners and managers, who could be getting away with overcharging and fraud.

## C.

The majority wants to stamp out "lawsuit-mining arrangements" and vexatious lawsuits. This is a worthy goal, but the majority takes an unprecedented step to achieve it. The majority restricts the tenants' right to contract, specifically, the right to enter into assignment contracts that provide a cost-efficient means of protecting against sharp billing practices and fraud by landlords at outlet malls. The State of Maryland does not have any fundamental policy or law that dictates this result. *Cf.* U.S. Const. art. I § 10 ("No State shall . . . pass any . . . law impairing the Obligation of Contracts"). Today's decision also means that AFS is barred from suing on the assigned claims that it legitimately owns. That is overkill.

## III.

The majority also holds that the assignments are void and unenforceable as a matter of public policy because, the majority claims, AFS is being paid a contingent fee for supplying expert testimony. I respectfully disagree. I recognize, of course, that "[a]n agreement with a witness to pay him a fee contingent on the success of the litigation is against public policy and void." *Van Norden v. Metson*, 171 P.2d 485, 488 (Cal. Dist. Ct. App. 1946). However, AFS was not hired to provide expert testimony. Instead, AFS was hired as an auditor, and any claims uncovered in the audit are assigned to AFS. The assignments make AFS the real party in interest, and a corporation that is a real party in interest may offer in its own case the testimony of its principals and employees.

Nor are AFS and the tenants attempting to mask a contingent fee witness arrangement behind an assignment. The assignments are, in most respects, routine. AFS has full authority to do what is necessary "to pursue and collect on the assigned causes of action," including settling in "its reasonable discretion." AFS must advance all litigation costs and is responsible for those costs if the litigation is unsuccessful. AFS does, of course, "receive as a commission for [its] services [forty

to fifty percent] of the Net Recovery." Nonetheless, because these contracts transfer the claims to AFS and provide that AFS will sue in its own name, control the litigation, and pay all litigation costs, they are true assignments. AFS is therefore the real party in interest, and it may offer the testimony of its own people without violating any public policy against supplying expert testimony for a contingent fee.

I respectfully dissent.